

**SO ORDERED.**

**SIGNED this 09 day of November, 2007.**

_____
A. Thomas Small
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| **CEDAR CREEK FIBERS, LLC** | 03-00838-8-ATS |
| DEBTOR | |
| | |
| **GERALD A. JEUTTER, JR., TRUSTEE** | |
| Plaintiff | ADVERSARY PROCEEDING NO. |
| v. | S-05-00128-8-ATS-AP |
| **FIBER INDUSTRIES, INC. and WELLMAN, INC.** | |
| Defendants. | |

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT
AND MOTION TO EXCLUDE EXPERT OPINION**

The matters before the court in this adversary proceeding are 1) the motion filed by the plaintiff, Gerald A. Jeutter, Jr., chapter 7 trustee for the estate of Cedar Creek Fibers, LLC, for partial summary judgment; 2) the motion filed by the trustee to exclude the opinion of the defendants' expert; and 3) the motion filed by the defendants, Fiber Industries, Inc. and Wellman, Inc., for summary judgment. A hearing was held in Raleigh, North Carolina on October 30, 2007.

Cedar Creek Fibers, LLC filed a petition for relief under chapter 7 of the Bankruptcy Code on January 29, 2003, and Shawna Y. Staton was appointed trustee. Gerald A. Jeutter, Jr. was substituted as trustee on April 3, 2007. On July 1, 2005, Ms. Staton filed this adversary proceeding against Fiber Industries, Inc. and its parent company, Wellman, Inc., to recover damages suffered by the estate as a result of environmental contamination on real property owned by the debtor.[1] Though the trustee originally sought damages under theories of breach of contract, statutory strict liability, negligence, nuisance, trespass, and negligence *res ipsa loquitur*, the parties stipulated to dismissal of the negligence, nuisance, trespass, and negligence *res ipsa loquitur* claims on August 17, 2007. The two remaining claims are for breach of contract and for strict statutory liability.

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(O), which this court may hear and determine.

Most of the background facts are undisputed. In 1998, Wellman, Inc. purchased real property located in Fayetteville, North Carolina from Celanese Fibers and Hoechst Celanese Corporation. In 1991, Wellman discovered that perchloroethyene (PCE) from its manufacturing operations had leaked into the groundwater, and that the PCE levels exceeded the North Carolina groundwater quality standards. The North Carolina Department of Environment and Natural Resources ("DENR") issued a notice of violation to Wellman on October 25, 1991. In 1994,

---

[1] The original complaint included Celanese Corporation, Celanese Fibers, Inc., Hoechst Celanese Corporation, and CNA Holdings, Inc. as defendants, but the claims against those defendants were dismissed by stipulation dated August 17, 2007.

Wellman submitted a corrective action plan to DENR adopting "monitored natural attenuation," a passive remediation approach, as its method for reducing the contamination. An adjacent property owner expressed concerns with the effectiveness of this approach, and the corrective action plan was not approved. Subsequent action plans have been submitted, but PCE levels at the property continue to exceed the state groundwater quality standards and the soil remains contaminated.

On May 8, 2002, Cedar Creek Fibers purchased a manufacturing business from Fiber Industries, Inc., a subsidiary of Wellman, pursuant to an Asset Purchase Agreement ("APA") for a purchase price of $1,688,050.52. The purchase included the Fayetteville real property as well as personal property assets. The APA did not allocate a price for the real property, but in documents filed with Cumberland County, a $150,000 purchase price was attributed to the real property for purposes of ascertaining the amount of real property taxes. In connection with the purchase transaction, the parties entered into several other agreements: These include a Chip Supply Agreement pursuant to which Fiber Industries sold resin chips to Cedar Creek for its manufacturing operations under a $2,000,000 line of credit, a Transition Services Agreement pursuant to which Fiber Industries provided office support to Cedar Creek, and an agreement pursuant to which the parties shared pro rata liability for property taxes.

Cedar Creek operated the business for several months, but the business did not succeed and Cedar Creek filed for chapter 7 bankruptcy relief on January 29, 2003. In March 2003, the trustee hired special counsel to assist with the sale of the real property, and on June 10, 2004, the court approved the trustee's sale of the real property to 3224 Investments, LLC, for the purchase price of $580,000. The trustee maintains that the fair market value of the property in 2004 was between $1,320,000 and $1,750,000, and that the property sold for substantially less than fair market value

because of the environmental contamination. The trustee seeks compensation for the diminution in value of the real property based on two theories: First, the defendants' contractual obligation to remediate the contamination and its promise to indemnify the debtor for losses resulting from the failure to fulfill that responsibility; and second, strict liability under North Carolina General Statute § 143-215.93, which is the North Carolina Oil Pollution and Hazardous Substances Control Act ("OPHSCA").

The defendants offer several defenses with respect to the trustee's claims for breach of contract. They contend that the only indemnification under the APA is indemnification to Cedar Creek for claims of third parties, and that there is no indemnification under the APA for diminution of the value of the real property. The defendants also maintain that the APA is an executory contract that was rejected by the inaction of the trustee, and is therefore unenforceable. Furthermore, they assert that any rights that the trustee had with respect to indemnification were transferred to the purchaser of the real property, 3224 Investments. Additionally, they contend that by approving the sale to 3224 Investments, the bankruptcy court conclusively determined that the sale was "fair and reasonable," and that any diminution in value was caused by factors other than contamination.

The defendants also have defenses with respect to the trustee's claim for strict liability under OPHSCA. According the defendants, the strict liability claim should be denied because the APA provides, pursuant to § 9.7 of the APA, that Cedar Creek's exclusive remedy for environmental claims is indemnification under APA § 7.19(b). Finally, the defendants maintain the PCE is not a hazardous substance under OPHSCA and that there is no evidence that contamination of the property caused by petroleum, which is a hazardous substance under OPHSCA, was the responsibility of the defendants.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam).  Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327, 106 S. Ct. at 2555.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552.  Summary judgment should not be granted "unless the moving party has established his right to a judgment with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982) (internal quotations omitted).

**I.     Breach of Contract**

    **A. The Contract Terms**

The plaintiff maintains that Wellman and Fiber Industries agreed to remediate the contamination and indemnify Cedar Creek for any loss related to the environmental contamination. According to the trustee, the diminution in value of the property is such a loss.  The defendants maintain that the contractual indemnification for the environmental condition of the property is limited to losses arising from third party claims, and that diminution in value of the property is not a recoverable loss.

The defendants' contractual obligations to Cedar Creek are set forth in the APA dated May 28, 2002. The relevant provisions of the APA, including the amendments specified in Amendment No. 1 to Asset Purchase Agreement (also dated May 28, 2002), include, in sequence, the following:

> 2.2 <u>Excluded Liabilities</u>. Buyer is not assuming or agreeing to pay, perform, assume or discharge, or otherwise be responsible for, any liabilities or obligations of Seller whether or not related to the Business, fixed or contingent that are not specifically Assumed Liabilities hereunder (collectively, the "<u>Excluded Liabilities</u>").
>
> 2.1 <u>Assumption of Liabilities by Buyer</u>. At the Closing, Buyer shall assume and thereafter pay, perform, satisfy and discharge the following obligations and liabilities (collectively, the "<u>Assumed Liabilities</u>"):
>
> > (a) <u>Obligations Under Agreements</u>. . . .
> >
> > (b) <u>Employee Obligations</u>. . . .
> >
> > (c) <u>Liabilities After Effective Date</u>. All liabilities and obligations arising from or in connection with the Business or the Assets (other than the Excluded Assets) as a result of the conduct or restart of the Business or use or maintenance of the Premises after the Effective Date, including but not limited to employee salaries and wages, health benefits in accordance with <u>Schedule 2.1(c)</u>, utility charges, raw material costs (other than as covered by the Supply Agreement), insurance coverages (specifically excluding property and casualty insurance coverages and rights and obligations related thereto) and other expenses and costs of the Business after the Effective Date, but excluding any allocation of indirect expenses or overhead from Parent to the Business (the "<u>Business Expenses</u>"); and
> >
> > (d) <u>Liabilities for Taxes</u>. . . . .
>
> * * *
>
> 7.19 <u>Environmental Covenant</u>. (a) From and after the Closing Date, Seller or Parent shall retain the obligation to comply at its sole expense with all applicable federal and state environmental regulatory requirements relating to any investigation and remediation of contaminated groundwater in, under and emanating from the Premises due to the release of Hazardous Substances which occurred prior to the acquisition by Seller in 1989 of the ownership and operation of the Premises, which release is further described in the documents listed on <u>Schedule 5.13</u> of this Agreement, <u>provided</u>, <u>however</u>, that Seller's obligation shall be fully discharged upon the receipt by Seller from the applicable federal or state regulatory agency of a letter of compliance, no further action letter or other comparable document indicating that no

further such investigation or remediation is required. Seller and Parent shall enter into an agreement in the form attached hereto as <u>Exhibit 4</u> relating to the ability of Seller and Parent to conduct monitoring of environmental conditions on the Premises after the Closing (the "<u>Access Agreement</u>").

(b) [as amended by Amendment No. 1 to Asset Purchase Agreement, ¶ 6] Each of the Seller and Parent, jointly and severally, shall indemnify and hold harmless Buyer and Subsidiary from and against all loss, cost, damage claims, liabilities and expense, including reasonable attorney's fees, incurred by Buyer and Subsidiary from and after the date of the Closing Date as a result of any claim, demand or action that may be asserted against Buyer and/or Subsidiary by any person arising under Environmental Law out of . . . any conditions, in, on or under the Premises existing before the Closing Date, <u>provided</u>, <u>however</u>, that such indemnification obligation of Seller shall not apply to (1) any release of hazardous substances or materials or violation of applicable Environmental Law which occurs at the Premises from and after the Closing Date and (2) any exacerbation of existing soil or groundwater conditions in, on, under or emanating from the Premises due to the act or omission other than by Seller from and after the Closing Date.

\* \* \*

9.1 [as amended by Amendment No. 1 to Asset Purchase Agreement, ¶ 8] <u>Indemnification by Seller and Parent</u>. Seller and Parent shall, jointly and severally, indemnify Buyer and, with respect to breaches of Section 5.6(a) only, Subsidiary, and each of Buyer's and, with respect to breaches of Section 5.6(a) only, Subsidiary's, officers, directors and employees (collectively, the "<u>Buyer Indemnified Parties</u>") and hold them harmless against and in respect of any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, damages, losses, liabilities, taxes and deficiencies and penalties and interest thereon and costs and expenses, including reasonable attorneys' fees and expenses (collectively, "<u>Losses</u>") to the extent resulting from (1) any breach of representation or warranty, or nonfulfillment of any covenant or agreement of Seller in this Agreement, [and] (2) the Excluded Liabilities . . . .

\* \* \*

9.3 <u>Period of Indemnity</u>. All representations and warranties of the parties contained in this Agreement shall survive the execution and delivery of this Agreement and shall continue in full force and effect for one year after the Closing Date and thereafter shall terminate, except that the representations and warranties and covenants of Seller set forth in Section . . . 7.19 . . . shall survive the Closing Date indefinitely . . .; provided, however, that if at or prior to the expiration of such period any claim for indemnification has been asserted, but not fully determined, such period will be extended as to such claim until it is finally determined. All covenants or agreements which by their terms are to be performed after the Closing Date shall survive until fully discharged. For the avoidance of doubt, it is understood

>and agreed that Seller's obligation to indemnify Buyer Indemnified Parties for Losses relating to Excluded Liabilities . . . shall survive the Closing indefinitely and without regard to the limitation set forth in Section 9.4 hereof.

Asset Purchase Agreement Among Cedar Creek Fibers LLC, Fiber Industries, Inc. and Wellman, Inc. (May 28, 2002) and Amendment No. 1 to Asset Purchase Agreement (May 28, 2002), attached as Ex. A to Defs.' Answer to Compl.

Wellman and Fiber Industries maintain that § 7.19(b) is the sole indemnification provision applicable to the environmental contamination, and that § 7.19(b) limits indemnification to reimbursement of losses resulting from "any claim, demand or action that may be asserted against Buyer." According to the defendants, because no claim, demand or action has been asserted against the debtor, there is no loss to indemnify. The court disagrees that the defendants' obligation with respect to environmental contamination is limited to § 7.19(b).

Section 7.19(a) requires Fiber Industries and its parent company, Wellman, "to comply at its sole expense with all applicable federal and state environmental regulatory requirements relating to any investigation and remediation of contaminated groundwater in, under and emanating from the Premises . . . .." Section 7.19(b) requires Fiber Industries and Wellman to indemnify Cedar Creek from "all loss, cost, damage claims, liabilities and expense, including reasonable attorney's fees" incurred by Cedar Creek "as a result of any claim, demand or action that may be asserted against Buyer [Cedar Creek] . . . by any person arising under Environmental Law." Section 7.19(b), however, is not the only indemnification obligation of the defendants.

Section 9.1 of the APA requires the defendants to indemnify Cedar Creek against "damages" and "losses" resulting from "nonfulfillment of any covenant or agreement of Seller [Fiber Industries] in this Agreement." Section 7.19(a) contains a covenant by Fiber Industries and Wellman to

remediate, and § 9.1 provides for the indemnification of the Buyer, Cedar Creek, for loss or damages arising from the failure to fulfill the covenant.  Further, § 9.3 says that the covenants provided in § 7.19 "shall survive the Closing Date indefinitely," and that "[a]ll covenants or agreements which by their terms are to be performed after the Closing Date shall survive until fully discharged."  The last sentence of § 9.3 is apparently included "[f]or avoidance of doubt," but that sentence creates more incertitude than it provides clarity.  Nevertheless, the indemnification obligation described in § 9.1, and the sentences of § 9.3 preceding the "clarifying" last sentence are very clear.  It is undisputed that the contamination was present prior to Cedar Creek's purchase of the property, and that it was not caused by the use or maintenance of the premises after the effective date.  Thus, any liability or loss resulting from the contamination is not an assumed liability. The plain language of the APA establishes a duty to remediate the environmental contamination and an obligation to indemnify Cedar Creek for losses suffered as a result of the existence of the contamination and the failure to remediate.

The trustee's position is also supported by the deposition testimony of Wellman's Rule 30(b)(6) witness, Dominic Russo, who agreed that the plain meaning of the contract appears to him to create a duty to indemnify Cedar Creek for the environmental contamination, "if it exists." (Russo Dep. at 112:1-15.)

   **B. Is the APA an Executory Contract that was Rejected?**

The defendants contend that the trustee's breach of contract claim must fail in its entirety because the APA is an executory contract that was not assumed by the trustee within 60 days of the bankruptcy filing, and is thus deemed rejected pursuant to 11 U.S.C. § 365(d)(1).

The United States Court of Appeals for the Fourth Circuit, in <u>Gloria Mfg. Corp. v. Int'l Ladies Garment Workers' Union</u>, 734 F.2d 1020 (4th Cir. 1984), adopted the "Countryman" definition which provides that for there to be an executory contract, "the obligation of both the bankrupt (now debtor) and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  Vern Countryman, <u>Executory Contracts in Bankruptcy: Part I</u>, 57 Minn. L. Rev. 439, 460 (1973); <u>see also</u> <u>Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.</u>, 756 F.2d 1043 (4th Cir. 1985) and <u>In re Sunterra Corp.</u>, 361 F.3d 257, 264 (4th Cir. 2004).  Here, the essential terms of the APA, with the exception of the ongoing covenants and indemnification provisions, were performed when the transaction closed in 2002.  The defendants argue that there remain unperformed obligations under the Chip Supply Agreement, the Transition Services Agreement, and the agreement related to the division of property taxes, which the defendants maintain are essential components of the purchase of the business by Cedar Creek and should be considered as part of the APA.  However, these agreements are entirely separate, and each is a separate executory contract.  The APA is not an executory contract and its covenants and indemnification provisions may be enforced by the trustee, even though there may be unperformed obligations under the other agreements.

**C. Were the Indemnification Provision and the Trustee's Cause of Action Assigned?**

The defendants contend that the indemnification rights of Cedar Creek and its trustee were assigned to the purchaser of the real property, 3224 Investments, when the property was sold. The property was conveyed to 3224 Investments pursuant to a trustee's deed and an assignment agreement.  That assignment agreement provided that

> [f]or value received, First Citizens and Trustee hereby sell, transfer and assign unto Assignee, its successors and assigns, all right, title and interest, both legal and equitable, of First Citizens and Trustee in and to (i) any and all environmental representations, warranties and indemnifications made to or given to Cedar Creek Fibers LLC, and/or its assigns, and to Fayetteville Fibers, Inc., and/or its assigns, under Sections 5.13 and 7.9 (or otherwise) of that certain Asset Purchase Agreement (Purchase Agreement) (all relevant sections of which are hereby incorporated by reference) entered into on May 28, 2002 . . . .

Assignment (June 18, 2004) at 1, attached as Ex. Z to Mem. of Law in Support of Defs.' Mot. for Summ. J.

The assignment transfers environmental indemnifications under sections 5.13 and 7.9 (or otherwise). Section 5.13 is a representation and warranty that Fiber Industries holds all necessary environmental permits, licenses, registrations and other authorizations required for the business to operate, and § 7.9 relates to transition services. It does not appear from the assignment that the trustee has transferred or assigned his cause of action against Fiber Industries or Wellman under either § 7.19(a) or § 9.1 .

### D. Approval of the Sale by the Bankruptcy Court

The defendants argue that when the court approved the sale by the trustee to 3224 Investments, the court made a finding that the sale was "fair and reasonable," and that that finding precludes the trustee from taking the position that the sale was for less than a fair value. The court's determination was that the sale was "fair and reasonable" given the existing circumstances, namely the condition in which the trustee found the property. The court's "fair and reasonable" determination related to the purchase price given the condition of the property, and did not in any way address the liability of anyone who was responsible for the property's contaminated condition.

**II.    OPHSCA Claim**

11

North Carolina General Statute § 143-215.93 provides that "any person having control over hazardous substances that enter the waters of the state in violation of this part shall be strictly liable, without regard to fault, for damages to persons or property, public or private." The defendants argue that the APA provides, in § 9.7, that the exclusive remedies under the agreement are contained in § 7.19(b) and Article 9 of the APA, and that those remedies are exclusive of any statutory remedy that would otherwise be available. The court disagrees with that argument. Any statutory liability arises independently of the contract, and the contract does not preclude its application.

Nevertheless, at the hearing, the trustee conceded that PCE does not come within the applicable definition of hazardous substance, and the trustee's statutory claim must fail with respect to PCE contamination. However, the trustee also maintains that petroleum was present in the groundwater and soil on the property, and because petroleum is a hazardous substance, the defendants have statutory liability under OPHSCA. There is no evidence that the defendants had "control over" petroleum when it entered the groundwater on the property, and defendants' motion for summary judgment on the statutory claim will be allowed.

### III.    Motion to Exclude Expert Opinion

The defendants retained Mr. Fitzhough Stout to render an expert opinion on the fair market value of the property. Mr. Stout's report concluded that the contamination did not reduce the value of the property, except to the extent that it might have extended the necessary marketing period for the property. In rendering his opinion on the value of the property in 2004, Mr. Stout calculated the time-value of money for the additional year of marketing that he believed would be necessary to achieve the full value of the property.

In his deposition, Mr. Stout was asked why he believed the property was sold for fair market value, and he responded that "[b]ased on my conversations with Mr. O'Callaghan, it appears to me that they [the former trustee and her counsel] didn't do the proper marketing." (Stout Dep.. at 86-87.) Mr. Stout further testified that he was told this only by Mr. O'Callaghan, the defendants' attorney. The trustee seeks to exclude any portion of Mr. Stout's opinion related to the marketing of the property, contending that this evidence is neither relevant or reliable. The defendants maintain that the trustee opened the door for Mr. Stout to give this opinion, and that the trustee failed to ask further questions to learn the information that was provided to Mr. Stout by Mr. O'Callaghan. The court agrees with the defendants that Mr. Stout's testimony should not be excluded.

## CONCLUSION

Based on the foregoing, the following issues in this adversary proceeding are determined: 1) the APA requires the defendants to remediate the contamination of the real property, and the defendants agreed to indemnify Cedar Creek for any loss, including diminution of value of the property, resulting from their failure to honor that obligation; 2) the APA is not an executory contract and therefore is not subject to rejection; 3) the trustee has not assigned his cause of action against the defendants; 4) the court's finding that the sale was "fair and reasonable" does not preclude the trustee from pursuing his claim against the defendants; and 5) the defendants have no liability to the trustee under OPHSCA.

There remain a number of issues for trial. There is a genuine factual dispute as to whether the defendants failed to remediate the property as required by the APA. There was no time table for remediation, Cedar Creek knew what action the defendants were or were not taking, and an early sale of the real property was most likely not contemplated by the parties. On the other hand, the

property was still contaminated. Also to be determined is whether the property's value was diminished by the contamination, and if it was, whether the damages should have been mitigated. Accordingly, the issues for trial have been narrowed as described above, but the plaintiff's motion for summary judgment and his motion to exclude expert testimony are **DENIED**. The defendants' motion for summary judgment is **DENIED** except that it is **ALLOWED** with respect to the plaintiff's statutory claim under OPHSCA.

**SO ORDERED.**

**END OF DOCUMENT**